

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

DEC 29 2008

MARY E. D'ANDREA, CLERK
Per _____

| | | |
|---|---|---|
| LYNETTE A. DiBRITO,<br>Plaintiff | : | |
| | : | NO. 1:08-cv-2308 |
| v. | : | |
| | : | Judge Conner |
| HARRISBURG AREA COMMUNITY<br>COLLEGE, EDNA V. BAEHRE, Ph.D,<br>and WINIFRED BLACK, Ed.D, | : | CIVIL ACTION |
| | : | |
| Defendants | : | JURY TRIAL DEMANDED |

## COMPLAINT

### Parties

1. Plaintiff Lynette A. DiBrito is an adult individual residing at 5475 Eagles Ridge Lane, Enola, Cumberland County, Pennsylvania 17025. During all relevant times in which events occurred giving rise to this cause of action, Lynette DeBrito, M.Ed. (hereinafter "DeBrito")was the Associate Dean of Student Life at the Harrisburg Campus of Harrisburg Area Community College.

2. Defendant Harrisburg Area Community College is a community college and part of the Pennsylvania's community college system, having been established on February 14, 1964, as Pennsylvania's first community college. It has administrative offices at One HACC Drive, Harrisburg, Pennsylvania 17110.

3. Defendant Edna Baehre, Ph.D is an adult individual and employed as the President of Harrisburg Area Community College (hereinafter, "Dr. Baehre" or "Baehre"). Baehre is named in her official capacity. For purpose of this Complaint, Baehre at all times relevant to the events described at paragraphs 7-34, infra. was a high managerial

employee of Defendant Harrisburg Area Community College and acting on behalf of that entity.

4. Defendant Winifred Black, Ed.D is an adult individual and employed as Vice President of Student Affairs and Enrollment Management for Harrisburg Area Community College (hereinafter, "Black"). She is sued in her official capacity. For purpose of this Complaint, Black at all times relevant to the events described after her employment at Harrisburg Area Community College was a high managerial employee acting on behalf of that entity.

## Jurisdiction

5. This Court has original jurisdiction over this matter pursuant to 28 U.S.C.§ 1331, as a case arising under the laws of the United States; specifically, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) (hereinafter, "Title VII"), which makes it unlawful for an employer to discriminate against any employee because she has opposed any practice made an unlawful employment practice by Title VII, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

6. On October 1, 2008, Plaintiff received notice of her right to sue from the Equal Employment Opportunity Commission ("E.E.O.C.") and, consequently, Lynette DeBrito has exhausted all administrative remedies and has taken all other steps necessary to bring this action before the Court (see Exhibit "A," appended to this Complaint, copy of said "Right To Sue" letter).

## Predicate Facts

7. Lynette DeBrito was initially employed by Defendant Harrisburg Area Community College (hereinafter, "HACC") on February 25, 2002 and is the Associate

Dean of Student Life at the Harrisburg Campus. Prior to this position, she had been employed in an administrative capacity at Minnesota State University.

8. Within several weeks of having been employed at HACC, DeBrito was cautioned by her then-supervisor, Maureen Kelly, to avoid three individuals who were trouble-makers, including an individual named Subrina Taylor (hereinafter, "Taylor"). As it turned out, all three were individuals of color.

9. After working with these individuals for several months, DeBrito concluded that the accusations were false.

10. On April 20, 2006, while attending the Student Government Association annual banquet, Defendant Edna Baehre, President of Harrisburg Area Community College, asked DeBrito how much time Subrina Taylor had been out of the office on leave. DeBrito replied that she was not sure, but pointed out that their supervisor, Chip Jackson, was also on medical leave during some of the time that Taylor had been out of the office.

11. This question took DeBrito by surprise, since she was a colleague of Subrina Taylor.

12. Shortly after the announced retirement of Chip Jackson, Vice President of Student Affairs and Enrollment Services, Baehre announced that she had decided to put the search for a new Vice President on a fast track and, subsequently, the position was posted so that those outside HACC who wished to submit credentials might do so.

13. Approximately two weeks later, Dr. Baehre met with the entire division of Student Affairs and Enrollment Management. She requested feedback and suggestions for the Vice President position description. After collecting suggestions, the position description was modified, notwithstanding the fact that applicants had already submitted materials.

14. DeBrito was concerned as to how a position description could be modified after applicants had already submitted credentials, so she e-mailed her concerns to Defendant Baehre.

15. On May 25, 2006, DeBrito received a telephone call from Defendant Baehre asking DeBrito to come to her office.

16. After arriving at her office, Baehre asked DeBrito if she was planning to apply for the position of Vice President of Student Affairs and Enrollment Management. When DeBrito responded in the negative, Baehre asked DeBrito whether she would be willing to serve on the search committee. DeBrito answered that she would be willing to serve.

17. On Thursday, June 1, 2006, the Vice President of Student Affairs and Enrollment Management Search Committee (hereinafter, "Search Committee") held its first meeting. The meeting was hosted by Nancy Rockey, Vice President of Communications and College Development (hereinafter, "Rockey"), Search Committee Chair appointed by Baehre. Members were told that it was their role to identify candidates to bring to campus and, following their interview, to develop lists of strengths and weaknesses for Dr. Baehre, who was to function as hiring manager.

18. On July 5, 2006, the Search Committee was to hold its first interviews by telephone. Subrina Taylor was the to be the first interviewee, and she was scheduled for 9:00 a.m. The interview began late because Nancy Rockey appeared late and had not made appropriate arrangements for a conference call.

19. During the course of Taylor's interview, Rockey was shuffling through papers, cleaning out her purse, and generating background noise which made it difficult to hear Taylor.

20. At the conclusion of the telephone interviews, the Search Committee was given a screening matrix which the group agreed to use to document observations and to score candidates.

21. At the next Search Committee meeting, the results of the telephone interviews were distributed. Subrina Taylor had a high score and, while there were some limitations noted, a large majority of the Search Committee felt that she should be a finalist for the position. According to the application documents reviewed by DeBrito, Taylor was the most qualified individual for the position.

22. Following the on-campus interviews, Nancy Rockey asked each member of the Search Committee to remain so that strengths and weaknesses of the candidates might be assessed. Although she had earlier e-mailed the Search Committee members concerning a meeting at a later date, she now stated that the Committee members should stay "so that we could get it out of the way."

23. During the discussion which ensued, Rockey observed that Subrina Taylor "misses a lot of work" and that she does not follow through on details. For example, she stated that twice Taylor failed to complete a grant application which cost the college much money. DeBrito reminded Rockey that Taylor had been on medical leave.

24. At the conclusion of the discussion, Rockey handed ballots for the Search Committee members to vote, "yes" or "no" as to whether the individual candidate was able to do the job. The ballots were tallied, and the number of votes attributed to Subrina Taylor exceeded the number of Search Committee members present.

25. Rockey told the Search Committee members that she would compile discussion notes and lists of strengths/limitations for each candidate and that she would send them out to Search Committee members before submitting them to Dr. Baehre. In fact, she did not, submitting all materials directly to Baehre without the approval of the Search Committee. These included the notes, vote results, and rankings.

26. On August 7, 2006, DeBrito received a telephone call from Defendant Baehre, who indicated that she had some questions regarding paperwork that she had received.

After DeBrito proceeded to Baehre's office, Barhre approached her with paperwork in hand which she pulled away at the last instant, and with a red face stated:

> You had better be careful. ... Someone on the Search Committee has breached confidentiality and shared things with Subrina Taylor ... and all fingers are pointing at you. You better expect some rough treatment over in Student Services, people aren't very happy with you. There are serious consequences for whoever did this. ... You had better be careful.

27. Baehre also indicated that Subrina Taylor knew more than she should have and that someone leaked information to her. She further stated that Search Committee members were all pointing their fingers at DeBrito.

28. As it turned out, Subrina Taylor was not selected for the position and subsequently left Harrisburg Area Community College and filed a Complaint with the Equal Opportunity Employment Commission ("E.E.O.C."), Sabrina Taylor v. Harrisburg Area Community College, EEOC Charge No. 530-2006-03707.

29. DeBrito supported the position of Subrina Taylor in the referenced EEOC proceeding by submitting a witness statement detailing her belief that Taylor was not selected based upon discrimination due to her race (see Exhibit "B," appended to this Complaint, copy of said witness statement).

30. The successful candidate for the position of Vice President of Student Services and Enrollment Management was Dr. Winifred Black, who became DeBrito's supervisor by virtue of obtaining that position.

31. The day following the Search Committee meeting when Nancy Rockey made the remarks concerning Subrina Taylor, referenced at paragraph 23 above (late July, 2006), DeBrito met with Ronald Young, Vice President of Student and Academic Affairs, to express her concern about the injection of racial considerations into the process and to report the discriminatory remarks made by Rockey.

32. In mid-August, 2007, DeBrito was interviewed by Human Resources at HACC relative to concerns about the Search Committee.

33. During the period of time since August, 2006, Defendants Harrisburg Area Community College, by and through Defendants Baehre and Black, have engaged in a course of retaliatory treatment of DeBrito including, but not limited to, the following:

a) Downward status change in terms of responsibilities, including being stripped of all major duties with the exception of student government and clubs/organizations. This included the loss of sixty (60%) percent of prior duties, including supervision of the Childcare Center; the Student Handbook; and college-wide commencement. In addition, DeBrito's role in the college judicial process has yet to be decided and may be removed, as well;

b) Downward status change from being an Associate Dean of Student Life to being a senior student campus director.;

c) Declassified in terms of salary scale to a lower level without administrative justification pursuant to a purported "reorganization;"

d) Given a negative rating on annual performance evaluation under area of "dependability/accountability;" which may lead to further decreases in status, and

e) Refusing to centralize DeBrito's position across HACC's various campuses, despite her request for the same, when other similarly-situated individuals were given the option to decide whether they wanted their new positions centralized or located in Harrisburg.

34. In addition to the retaliatory actions taken, as detailed at paragraph 33(a)-(e) above, Defendant Winifred Black – the successful candidate over Subrina Taylor - has engaged in a course of harassment toward DeBrito, including, but not limited to the following:

a) On May 7, 2008, Black confronted DeBrito regarding "rumors" heard concerning DeBrito's intent to ruin Spring 2008 Commencement ceremonies scheduled for May 12, 2008. Stating that she heard such a rumor from three different sources, she refused to tell DeBrito who was making such outlandish statements. Black again confronted DeBrito on October 20, 2008;

b) On May 28, 2008, Black compelled DeBrito to appear for work, notwithstanding the fact that DeBrito had approved Family and Medical Leave

("FMLA") status for a diagnosed illness. Black said that DeBrito "missed too much work;"

c) Black has engaged in repeated hostile communications with DeBrito, causing stress and inflaming a pre-existing illness on the part of DeBrito. One example of such communications was telling DeBrito that she [DeBrito] "was the problem," not the system, when DeBrito had stated that there was an imbalance in the system of work demand between being an administrator as well as a front-line access person for students;

d) engaging in generally harassing behavior designed to intimidate and punish DeBrito, such as demanding to know why DeBrito had not answered a cell phone call on Saturday, November 8, 2008, when she was not on the job, or terming DeBrito "insubordinate" when she would not give security her cell phone number; and

e) establishment of unreasonable deadlines and expectations designed to drive DeBrito out of her position at HACC.

35. The retaliatory actions by Harrisburg Area Community College, acting through Baehre and Black, as detailed at paragraph 33(a)-(e) above, constitute adverse or tangible employment actions cognizable under Title VII because they represent a materially adverse change in the terms and conditions of DeBrito's employment. Indeed, DeBrito has gone from a rising star before the Search Committee incidents described above to her present situation in which she is being pushed out of her position step-by-step.

36. The actions of Defendant Winifred Black, as detailed at paragraph 34(a)-(e) above, constitute severe or pervasive retaliatory harassment by a supervisor cognizable under Title VII.

Application of Law.

37. The factual allegations contained at paragraphs 7-34 of the Complaint are incorporated by reference, as if fully set forth in their entirety.

38. Plaintiff Lynette DeBrito engaged in protected activity when, a) she contacted Vice President of Student and Academic Affairs, Ronald Young, relative to her concerns of racial discrimination, as described at paragraph 31 above; and b) by supporting the claim of Subrina Taylor before the United States Equal Employment Opportunity Commission, including her testimony by virtue of furnishing the witness statement contained at Exhibit "B" to this Complaint.

39. Plaintiff Lynette DeBrito suffered tangible employment actions and harassment at the hands of Defendants Harrisburg Area Community College, Edna Baehre, and Winifred Black, as delineated at paragraphs 33(a)-(e) and 34(a)-(e) above.

40. Said tangible employment actions and harassment were the result and causally connected to DeBrito's engaging in activities protected by Title VII of the Civil Rights Act of 1964, as amended.

41. As a result, Plaintiff Lynette DeBrito has suffered emotional damages, including aggravation of pre-existing medical conditions, brought on by the stress imposed by the Defendants' actions.

42. The actions of Defendants were malicious, outrageous, deliberate, and in disregard to DeBrito's federally protected rights guaranteed by Title VII of the Civil Rights Act of 1964, as amended. As such, she is entitled to an award of punitive damages.

43. Plaintiff Lynette DeBrito, pursuant to Rule 38(b)(1) of the Federal Rules of Civil Procedure, hereby demands a jury trial on all issues triable by this Complaint.

WHEREFORE, Plaintiff requests that judgment be entered in her favor and against Defendants, and that the Court award compensatory damages, including those associated with her emotional distress; reasonable attorney's fees and costs, as permitted by statute; together with the imposition of a punitive damages award.

Respectfully submitted,

*/s/ John M. Kerr*
John M. Kerr, Esquire
Attorney I.D.#26414
Law Office of John M. Kerr, Esquire
5020 Ritter Road
Suite 109
Mechanicsburg, PA 17055
(717) 766-4008
(717) 766-4066 (fax)
kerrlaw@comcast.net

Dated: December 29, 2008

161 (rev 2/17/08).

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Lynette Di Brito  
5475 Eagles Ridge Lane  
Enola, PA 17025

From: Equal Employment Opportunity Commission  
Philadelphia District Office  
801 Market Street, Suite 1300  
Philadelphia, PA  19107-3127

[ ]  On behalf of person(s) aggrieved whose identity is CONFIDENTIAL. (29 CFR § 1601.7(a))

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2007-02009 | Legal Unit | (215) 440-2828 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[ ]  Your charge was not timely filed with EEOC. In other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[X]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other (briefly state) _____

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____     September 29, 2008  
Marie M. Tomasso, District Director       (Date Mailed)

Enclosure(s)  
Information Sheet

cc:  Harrisburg Area Community College  
     David R. Keller, Esquire (For Respondent)

Exhibit "A"

DiBrito Statement
- 1 -

Within the first few weeks (nearly 4 ½ years ago) of working at HACC, I was advised by my supervisor, Maureen Kelly that there were certain individuals that caused trouble and I should avoid them as much as possible. She specifically mentioned Subrina Taylor and two other college employees. I noted that everyone she advised me as being suspect were also persons of color. After a few months of working with the individuals, I decided the accusations made by Maureen Kelly were false. I relayed this story later to Subrina Taylor as I was concerned about how she was being treated and perceived at the college. It is also important to state that Maureen Kelly was involved in a long term, personal relationship which involved spa treatments, social dinners, etc. with Edna Baehre and Nancy Rockey.

On April 10, 2006, Edna Baehre requested to meet with the Student Services Management Team which consisted of Subrina Taylor, Dory Leahey, Connie Martinez and me. When Subrina, Connie and I arrived to the on campus meeting which was held in Edna Baehre's office, we were informed by Edna that she met individually with Dory Leahey off campus due to a scheduling issue. I found this decision surprising and disturbing since she placed a strong emphasis that all of us meet together. I perceived his action as favoritism toward Dory.

On April 20, 2006 while attending the Student Government Association (SGA) annual banquet, I was seated next to Edna Baehre during dinner. During the dinner conversation, Edna asked me about how much time Subrina Taylor had been out of the office on leave. Her questioning surprised me as I am a colleague of Subrina Taylor. I stated to her that I wasn't exactly sure but that I knew our Supervisor, Chip Jackson, was also on medical leave during some of the time that Subrina was out of the office.

Shortly have the announced retirement of Chip Jackson, Vice President for Student Affairs and Enrollment Services; Edna Baehre announced that she had made the decision to put the Vice President's search on the "fast track". Shortly thereafter, the position was posted external of the college. Approximately two weeks later, Edna Baehre met with the entire division of Student Affairs and Enrollment Management. During this meeting, Edna asked for feedback and suggestions on the VP position description. After collecting feedback from the group, the position description was modified to include the recommendations. Being concerned, I sent an email to Edna Baehre stating my concern. I received an email response from Meredith Tulli, Human Resources Director stating that it was ok to modify a position description if only the preferred qualifications are modified. I am still confused as to how modifying a position description, even the preferred qualifications, would not affect applicants that already submitted materials.

On May 25, 2006, I received a telephone call from Edna Baehre asking me to come to her office. When I arrived to her office, she asked me if I was planning to apply for the Vice President of Student Affairs and Enrollment Management position. I stated that I was not intending to apply for the position. She then stated that since I was not going to be an applicant she would like me to serve on the Search Committee. I responded by saying "Yes" to serving on the search committee.

Exhibit "B"

DiBrito Statement
- 2 -

On Thursday, June 1, 2006 the Vice President of Student Affairs and Enrollment Management Search Committee held its first meeting. The meeting was hosted by Nancy Rockey, Search Committee Chair appointed by Edna Baehre. Edna Baehre also attended the meeting. During her remarks, Edna Baehre stated that she trusted the Search Committee and their insights throughout the search process. During this meeting, the Human Resources staff member went over the guidelines, expectations and role of the Search Committee. We were told that it was our role to identify candidates to bring to campus and once we interviewed them on campus, to develop lists of strengths and weaknesses for each candidate. Our collective list of each candidate's strengths and weaknesses would then be sent to Dr. Baehre, hiring manager. Nancy Rockey concluded the meeting saying that she would send sample questions to each Search Committee member so that we could begin developing what questions we would want to ask. To my knowledge, Nancy Rockey never sent out any sample questions.

On July 5, 2006 the Search Committee reconvened upon the direction of Nancy Rockey. Five telephone interviews were scheduled for the day with the first interview scheduled to begin at 9:00 AM. Subrina Taylor was the first candidate on the schedule for July 5, 2006. According to the schedule, she was to be interviewed from 9:00 AM – 9:30 AM. I arrived to the meeting room at 8:45 AM. When I entered the room, only one other Search Committee member was present. Within the next five minutes almost all of the Search Committee members had arrived, with the exception of Nancy Rockey. Nancy Rockey did not arrive to the meeting room until 9:15 AM. Once she arrived the Search Committee was ready to begin interviews, however, Nancy had not made arrangements for a conference telephone.

Once the telephone interview was finally underway, almost 20 minutes later, there appeared to be a bad connection on the telephone line. Most of Subrina Taylor's interview had background scratchy noises and her voice kept cutting in and out. Nancy Rockey was sitting closest to the telephone. I noticed that she was shuffling through several papers and making a fair amount of noise. It was soon determined that the rattling papers were the cause of the phone cutting in and out. I also observed Nancy Rockey, during the interview with Subrina Taylor, clean out her purse. At the end of the interview, Nancy collected the garbage she had found in her purse and took it to the trash can.

**It should be noted that I recall at least two other candidates who had telephone technical difficulties. Dr. Lori Fair and Dory Leahey also experienced some cutting in and out of the telephone, but not to the level experienced by Subrina Taylor.

At the end of the telephone interviews, the Search Committee was given a screening matrix by a fellow committee member. It was decided by group consensus that we would use these forms to document our observations and score candidates. At the next Search Committee meeting, the results of the telephone interviews were distributed, Subrina Taylor had a high ranking score. When the Search Committee discussed her candidacy, there were some limitations noted but by large majority the Search Committee believed she should be a finalist for the position.

According to the application documents I read, Subrina Taylor had the highest and most qualifications for the position.

Prior to the on campus candidate interviews, I received and email from Nancy Rockey telling all of the Search Committee members that she would be in touch with us after the on campus interviews to schedule a day and time to compile our strengths and weaknesses list.

DiBrito Statement
- 3 -

However, at the end of the campus interviews, Nancy asked us all to stay so we could get it out of the way. It was during this time that I observed the following:

    1. Nancy commented that Subrina Taylor misses a lot of work.
    2. Nancy commented that Subrina Taylor does not follow through on things. She stated to the Search Committee that not once, but twice, Subrina Taylor didn't complete a grant application and that the college lost a lot of money because of it. 3. I reminded Nancy Rockey that Subrina Taylor had been out on medical leave.
    4. Nancy Rockey handed out "ballots" to each Search Committee member. Each committee member was asked to vote "yes" or "no" if each candidate could do the job.
    5. The ballots were tallied; the number of votes reported for Subrina Taylor exceeded the number of Search Committee members present.
    6. Nancy Rockey stated that she would compile our discussion notes and lists of strengths and limitations for candidates. She said she would send them out to all of the Search Committee members to review before she submitted them to Dr. Baehre. In fact, Nancy Rockey sent the notes she compiled included the voting results directly to Dr. Baehre without the approval of the search committee. These documents including the vote results were sent to Edna Baehre providing her with rankings.

    On August 7 2006, I received a telephone call from Edna Baehre. She said that she had some questions regarding some paperwork she had received. I immediately walked to her office. As I entered her office, she immediately stood up and crossed the room with the paperwork in hand. She asked if I could assist her in completing it. She then stopped, took the papers and held them out to me. As I reached for the papers, she pulled them away. Her face began to turn red and said, "You had better be careful…someone on the search committee has breached confidentiality and shared things with Subrina Taylor….and all fingers are pointing at you." As she continued to speak, she appeared to become more agitated. She continued in a stern voice, "You better expect some rough treatment over in Student Services, people aren't very happy with you." Edna stated that Subrina Taylor knew more than she should and that someone leaked information to her. She stated that the Search Committee members were all pointing their fingers at me. She concluded by saying, "There are serious consequences for whoever did this…you had better be careful." I left her office.

```
Court Name: Pennsylvania Middle
Division: 1
Receipt Number: 111884941
Cashier ID: jcardile
Transaction Date: 12/29/2008
Payer Name: JOHN KERR
------------------------------
CIVIL FILING FEE
 For: JOHN KERR
 Case/Party: D-PAM-1-08-CV-002308-001
 Amount:      $350.00
------------------------------
CHECK
 Check/Money Order Num: 1337
 Amt Tendered: $350.00
------------------------------
Total Due:     $350.00
Total Tendered: $350.00
Change Amt:    $0.00


Only when bank clears the check or
verifies credit of funds is the fee
or debt officially paid or
discharged. A fee of $45.00 will be
charged for returned checks.
```

CV-08-2308

FILED
HARRISBURG
DEC 2 9 2008
MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk